UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
             :

**HENRY BRESILIEN,**
             :

                 Plaintiff,
             :

             :     **MEMORANDUM DECISION AND**
             :     **ORDER**

        – against –
             .     16-cv-4857 (AMD) (RER)
             :

**THE CITY OF NEW YORK ("NYC"),**
             :
**THOMAS BRADLEY**, individually and in his
             :
capacity as a Lieutenant in the FDNY,
             :

             :

                Defendants.
             :
------------------------------------------------------------ X

**ANN M. DONNELLY**, United States District Judge:

Henry Bresilien initiated this civil rights action on August 30, 2016, and filed an amended complaint on March 13, 2017. (ECF Nos. 1, 16.) On February 20, 2018, I granted in part and denied in part the defendants' motion to dismiss, allowing the following claims to proceed: (1) Title VII retaliation claim; (2) New York State Human Rights Law and New York City Human Rights Law retaliation claims; (3) Sections 1981 and 1983 discrimination claims against New York City and Thomas Bradley; (4) Section 1983 retaliation claim against Thomas Bradley; and (5) Section 1983 due process claims. (ECF No. 24 at 16.) The defendants now move for summary judgment on these claims. (ECF Nos. 36, 38.) For the reasons that follow, the defendants' motion is granted in part and denied in part.

## BACKGROUND[1]

### 1. *The Plaintiff's Hiring by the FDNY*

The plaintiff is an African-American man. (ECF No. 40, Pl.'s 56.1 Counter-Statement ("Pl.'s 56.1") ¶ 7.)[2] In 1999, the plaintiff applied to be a firefighter with the FDNY, his "dream job," but never got a response.[3] (ECF No. 36-5, Bresilien Dep. at 28:1-29:12.) Two years later, the plaintiff accepted a job as a peace officer with the City University of New York, a position he held for twelve years. (*Id.* at 22:1-9.)

In July of 2009, the Honorable Nicholas G. Garaufis found that the written exams the City gave to entry-level firefighter applicants had an unlawful disparate impact on Black and Hispanic candidates. *United States v. City of New York*, 637 F. Supp. 2d 77 (E.D.N.Y. 2009). Judge Garaufis determined that victims of the City's discrimination were eligible for individualized relief, including priority hiring by the FDNY, back pay, retroactive seniority and certain noneconomic damages. *See United States v. City of New York*, 905 F. Supp. 2d 438 (E.D.N.Y. 2012). The Vulcan Society notified the plaintiff about the remedial program (Bresilien Dep. at 29:13-19), and the FDNY hired the plaintiff as a "priority hire" in 2013 (Pl.'s 56.1 ¶¶ 8-9).

---

[1] In deciding whether summary judgment is appropriate, the Court resolves all ambiguities and draws all reasonable inferences in favor of the non-moving party, in this case, the plaintiff. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010).

[2] On a motion for summary judgment, the Court's consideration is limited to factual material that would be admissible in evidence at trial. *Local Unions 20 v. United Bhd. of Carpenters and Joiners of Am.*, 223 F. Supp. 2d 491, 496 (S.D.N.Y. 2002). Factual allegations that are disputed without a citation to admissible evidence are deemed admitted, as long as they are also supported by the record. Local Civ. R. 56.1; *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). Factual allegations that are not disputed are deemed admitted, as long as they are also supported by the record. *Id.* I will disregard any arguments in the Rule 56.1 statements. *Pape v. Dircksen & Talleyrand Inc.*, No. 16-CV-5377, 2019 WL 1435882, at *2 (E.D.N.Y. Feb. 1, 2019), *report and recommendation adopted*, 2019 WL 1441125 (E.D.N.Y. Mar. 31, 2019).

[3] As part of the application process, the plaintiff sat for an entrance exam in 1999. (Bresilien Dep. 29:2-8.)

The plaintiff started his career with the FDNY as a "Probationary Firefighter" training in "Probationary Firefighter School." (*Id.* ¶¶ 8, 10.) The probationary period was to last one year. (*Id.* ¶ 17.) However, pursuant to New York City regulations, a probationary term "is extended by the number of days when the probationer does not perform the duties" of the position, including, for example, when he is on limited duty status or sick leave. (*Id.* ¶ 18.)

On July 22, 2013, a week before his start date, the plaintiff signed a letter acknowledging the requirements for successful completion of the training program, which included physical fitness proficiency and a passing grade on a medical evaluation. (*Id.* ¶¶ 10, 11.) The letter specified that the "[f]ailure of any portion or portions of this medical evaluation, as determined by the FDNY Chief Medical Officer, can be grounds for medical disqualification and result in automatic termination of employment with the FDNY." (*Id.* ¶ 11.) The letter also informed the plaintiff that completing the training program did not entitle him to a tenured firefighter position. (*Id.* ¶ 12.) Rather, "[i]n order to attain and maintain tenure in the position of Firefighter, the [probationary firefighter] must comply with all applicable requirements of the City of New York, the FDNY, and the FDNY Oath of Office." (*Id.* ¶ 13.)

## 2. *The Plaintiff's Performance at the Fire Academy*

The plaintiff, forty-two years old when he began his training on July 29, 2013, was one of 320 probationary firefighters enrolled in the fire school. (*Id.* ¶¶ 20-22.) Two days in to his training, the plaintiff submitted a resignation letter to the Administrative Chief, citing the physical difficulties of completing fire school at his age:

> When I woke up this morning, August 1, 2013, I realized the chance given to me has come too late because of my current age and I did not expect the training to take the toll it did on my body. If the chance had been given to me twelve years ago, I would have had a greater chance as [sic] success and hopefully made a bigger difference in my life. However, I had a great experience and enjoyed my time while I was there with the other trainees. I tried to give it the best I could,

> but I wish all my former Probationary Fire Fighters and every other individual at
> the academy success. Thank you for the opportunity.

(*Id.* ¶ 23.)

At his deposition, however, the plaintiff testified that he tried to resign because the
instructors at fire school were ridiculing him in front of the class, telling him "You are old man.
Why don't you quit[?] Look at him. What's he doing here[?]" (Bresilien Dep. at 40:23-41:5.)
In any event, after receiving the letter, an FDNY captain told the plaintiff that the FDNY
Commissioner wanted the plaintiff to return to fire school. (Pl.'s 56.1 ¶ 26.) Accordingly, the
plaintiff withdrew his resignation and resumed his training. (*Id.* ¶ 28.)

On August 6, 2013, the plaintiff injured his back while operating a charged hose line
during training. (*Id.* ¶¶ 50-51.) Doctors at Metropolitan Hospital treated him and referred him to
the Bureau of Health Services, a City agency staffed with physicians, nurses and other medical
staff tasked to monitor firefighters' fitness for duty. (*Id.* ¶¶ 32, 52-53.) BHS doctors evaluate
firefighter personnel and designate them as eligible for full duty, light duty or medical leave; the
doctors make these decisions in their sole discretion. (*Id.* ¶ 36, 45.) Full duty firefighters are
able to perform all of the duties of their position. (*Id.* ¶ 41.) Light duty firefighters cannot
perform full duties because of medical issues, but can perform temporary administrative duties,
including messenger duties, clerical functions, phone operations, maintenance work, security
detail, hydrant inspections and building inspections, while they recover. (*Id.* ¶¶ 37-39.)
Firefighters who are medically unable to perform either full duty or light duty are placed on
medical leave. (*Id.* ¶ 42.)

Firefighters on medical leave or assigned light duty are scheduled for periodic medical
evaluations. (*Id.* ¶ 43.) If BHS doctors determine that a firefighter has recovered from his injury
and can perform all of a firefighter's duties, the firefighter is returned to full duty status. (*Id.* ¶

44.) However, a probationary firefighter who is placed on medical leave or light duty status before completing training must perform non-firefighting duties even once he is back on full duty status, until he can enroll in the next fire school class. (*Id.* ¶ 46.)

### 3. *The Plaintiff's Medical History*

On August 7, 2013, the day after he was injured, doctors at the BHS examined the plaintiff and placed him on medical leave. (*Id.* ¶¶ 54-55.) During a follow-up exam two days later, the plaintiff told a BHS doctor that he "does not feel able to continue training at this point." (*Id.* ¶ 56.) Then, on August 12, 2013, the plaintiff reported to a BHS doctor that he was "unable to run or jog" and "does not feel ready to return to training." (*Id.* ¶ 57.) The BHS doctors designated him eligible for light duty to begin the next day and to last until October. (*Id.* ¶¶ 58-59.)

The plaintiff spent the next sixty-nine days—from August 13, 2013 until October 21, 2013—doing administrative work in the BHS clinic. (*Id.* ¶¶ 60-61.) On October 18, 2013, a BHS doctor examined the plaintiff and placed him on full duty, effective October 21, 2013. (*Id.* ¶ 63.) On December 3, 2013, the plaintiff told a BHS physician that he had headaches, a cough and shortness of breath, at which point he was taken to the emergency room and placed back on medical leave. (*Id.* ¶¶ 65, 67.)

The plaintiff spent the next ninety-eight days on medical leave, meeting regularly with BHS doctors. On December 31, 2013, a BHS doctor diagnosed the plaintiff with reactive airway disease after a positive Methacholine Challenge Test.[4] (*Id.* ¶ 71.) The plaintiff continued to experience shortness of breath over the next three months, which made him unfit for full or light duty. (*Id.* ¶¶ 72-73.) On March 8, 2014, the plaintiff complained of shortness of breath and a

---

[4] BHS doctors later characterized the plaintiff's "overall clinical picture" as "consistent with asthma." (*Id.* ¶ 77.)

BHS doctor prescribed Albuterol and Symbicort, and designated the plaintiff for light duty effective March 10, 2014. (*Id.* ¶¶ 73-74.) The plaintiff performed light duty until January 14, 2015, when he was notified that he was being terminated. (*Id.* ¶¶ 74, 85.)

During his time at the FDNY, the plaintiff was on medical leave for 105 days, on light duty for 379 days and on full duty for less than forty-five days. (*Id.* ¶¶ 79, 82.) He did not complete the fire school training. (*Id.* ¶ 81.)

4. *The Plaintiff's Light Duty at the BHS*

The plaintiff spent most of his time on light duty performing administrative tasks at the BHS. At the time, Lieutenant Thomas Bradley was the Executive Officer of the BHS. (ECF No. 36-12, Bradley Dep. at 13:14-15:8.) The plaintiff testified at his deposition that firefighters at the BHS mistreated him because of his race and his status as a priority hire. According to the plaintiff, they frequently referred to him as "priority hire" and joked to each other that he could be the next chief or captain because of the remedial program's retroactive seniority benefit. (Bresilien Dep. at 51:7-52:9, 53:15-23.)

The plaintiff's relationship with Lieutenant Bradley was especially bad. (*Id.* at 69:7-10.) He claims that Lieutenant Bradley ordered him to his office on numerous occasions for no reason. (*Id.* at 69:11-18, 85:2-11.) He also claims that he overheard Lieutenant Bradley talking about him to a BHS doctor, saying "[O]h, he's an old man, what's he still doing there." (*Id.* at 69:14-18.) According to the plaintiff, on one occasion, Lieutenant Bradley, Captain Boccaro and other lieutenants accused him of being insufficiently respectful, and forced him to stand at attention against a wall for an hour until there were tears in his eyes. (*Id.* at 69:19-70:18.)

At his deposition, Lieutenant Bradley testified that he had no interactions with the plaintiff when he was the Executive Officer for the BHS, and specifically denied ordering the plaintiff to stand against a wall at attention. (Bradley Dep. at 21:19-22, 24:7-23.)

### 5. *The Plaintiff's Termination*

On July 14, 2014, Kerry J. Kelly, M.D., the Chief Medical Officer of the FDNY, scheduled the plaintiff to appear before the BHS Physician Board on July 16, 2014. (ECF No. 43 at 18; Pl.'s 56.1 ¶ 75.) Fifteen officials attended the meeting, including Dr. Nolan, the plaintiff's treating physician at the BHS. (Bresilien Dep. at 97:2-99:22.) Members of the Board questioned the plaintiff about his respiratory issues. Although Dr. Nolan told the plaintiff to expect a letter with the Board's decision within a month, the plaintiff never received a decision. (*Id.* at 90:3-7.) Nevertheless, according to Dr. Kelly, a probationary firefighter can be terminated for being unable to return to full duty status, "despite a referral to, appearance in front of or evaluation by the BHS Physician Board (formerly referred to as the 3 Physician Board) concerning the Probationary Firefighter's fitness for duty." (ECF No. 36-11 ¶ 18.) According to Dr. Kelly, the plaintiff would "never be able to perform the duties of a firefighter with the FDNY as a result of his medical condition." (*Id.* ¶ 20.)

On January 14, 2015, still on light duty, the plaintiff was terminated from his position as a "probationary firefighter." (Pl.'s 56.1 ¶ 85, 87; ECF No. 36-17.) He was offered two opportunities to resign that same day, but refused. (*Id.* ¶ 86; ECF No. 36-18.) He did not file an Article 78 proceeding in state court challenging his termination. (*Id.* ¶ 88.)

The plaintiff testified to his belief that he was terminated because of his race and his status as a "priority hire." (Bresilien Dep. at 63:17-24.) As support, the plaintiff cited the FDNY's racist culture as documented in the exam litigation before Judge Garaufis, and the fact

that Lieutenant Bradley and others harassed him. (*Id.* at 78:1-79:20.) The plaintiff also cites an

affidavit from Sharron Hampton, Lieutenant Bradley's colleague at the BHS, in which Hampton

avers that Bradley took "great pleasure in demeaning members of the FDNY who were of color,"

and that he has "animus towards people of color." (ECF No. 43 at 36.)[5]

## LEGAL STANDARD

Summary judgment is appropriate only if the parties' submissions, including deposition

transcripts, affidavits or other documentation, show that there is "no genuine dispute as to any

material fact," and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

*see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The movant has the

burden of showing the absence of any genuine dispute as to a material fact. *McLee v. Chrysler*

*Corp.*, 109 F.3d 130, 134 (2d Cir. 1997) (citation omitted). A fact is "material" when it "might

affect the outcome of the suit under the governing law," and an issue of fact is "genuine" if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Barlow*

*v. Male Geneva Police Officer Who Arrested Me on Jan. 2005*, 434 F. App'x 22, 25 (2d Cir.

2011) (internal citations omitted). Once the moving party has met its burden, the party opposing

summary judgment must identify specific facts and affirmative evidence that contradict those

---

[5] The defendants challenge the Hampton affidavit on the grounds that it is not based on her personal knowledge and contains generalized and conclusory statements. (ECF No. 45 at 8-9.) Rule 56 of the Federal Rules of Civil Procedure permits the Court to consider a declaration on summary judgment if it is made on personal knowledge and includes facts that would be admissible in evidence. Fed. R. Civ. P. 56(c)(4). A court may strike portions of an "affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." *Shepard v. Frontier Comm. Srvs., Inc.*, 92 F. Supp. 2d 279, 285 (S.D.N.Y. 2000) (quoting *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999)), *abrogated on other grounds by Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000). Based on her time working at the BHS, where she was an "acquaintance" of Lieutenant Bradley, Ms. Hampton states that Lieutenant Bradley was "involved in all aspects of BHS including the disability board process" and "seemed to take great pleasure in demeaning members of the FDNY who were of color." (ECF No. 43 at 36.) Ms. Hampton does not identify her role or function at the BHS, so her statements about Lieutenant Bradley's day-to-day responsibilities lack any foundation. Further, her statements about Lieutenant Bradley's racial animus are generalized and conclusory. Accordingly, I do not consider Ms. Hampton's affidavit on summary judgment.

offered by the moving party to demonstrate that there is a genuine issue for trial. *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## DISCUSSION

The plaintiff asserts a variety of claims for discrimination and retaliation under federal, state and local laws. The plaintiff asserts race discrimination claims under Sections 1981 and 1983, retaliation claims under Title VII, the New York State Human Rights Law, the New York City Human Rights Law and Section 1983, and due process violations under Section 1983. The plaintiff does not differentiate between the facts giving rise to his discrimination claims and his retaliation claims. But the essence of the plaintiff's claims is that he suffered discrimination on the basis of his race and retaliation for his status as a priority hire in connection with the firefighter exam litigation.

### I. Discrimination Claim Under Section 1983[6]

To prevail on a Section 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right. *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citing 42 U.S.C. § 1983). Section 1983 claims asserting employment discrimination use the same burden-shifting framework developed by the Supreme Court for Title VII claims. *See Sorlucco v. N.Y.C. Police Dep't*, 888 F.2d 4, 6-7 (2d Cir. 1989) ("The Supreme Court has outlined a three-step analysis of factual issues in Title VII claims . . . By analogy, the same analysis applies to claims under section 1983.") (citing *McDonnell Douglas Corp. v. Green*, 411

---

[6] Section 1981 does not provide a separate private right of action against state actors. *See Duplan v. City of New York*, 888 F.3d 612, 619-21 (2d Cir. 2018); *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989) ("[T]he express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units[.]"). Accordingly, I dismiss the Section 1981 claims.

U.S. 792 (1973) (citations omitted)). Under this framework, a plaintiff must first establish a *prima facie* case of discrimination—that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination. *See Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010) (citations omitted). Once a plaintiff meets this initial burden, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the termination. *Id.* If the defendant does so, the burden returns to the plaintiff to show that the real reason for his termination was his race. *Id.*

The defendants argue that the plaintiff cannot establish a *prima facie* case of discrimination because there is no evidence in the record that he was fired because of his race. Even if the plaintiff could establish a *prima facie* case, the defendants maintain that they fired him for the legitimate, non-discriminatory reason that his medical conditions rendered him unable to perform firefighting duties.

The plaintiff argues that he endured race-based hostility from his superiors at the fire school and the BHS, and that the "totality of the indignities" he suffered—"manipulation of his work and employment status, the improper medical board process, the unannounced and unnecessary extension of his probationary status, the lack of a single work performance evaluation after one and one half years on the job, and his ultimate 'at-will' termination"—were the result of discrimination. (ECF No. 43-1 at 8-9.) The plaintiff argues that he "intends to establish at trial" that the defendants' proffered non-discriminatory reason for firing him was pretextual. (*Id.*)

a. *The Plaintiff's Prima Facie Case*

The parties do not dispute that the plaintiff is a member of a protected class, that he was qualified for the position that he held or that he suffered an adverse employment action when he was fired from his job. The dispute is whether the circumstances of the plaintiff's firing give rise to an inference of discrimination. The plaintiff argues that Lieutenant Bradley's alleged comments and conduct give rise to an inference of discrimination. (*Id.* at 8.) The defendants respond that the alleged statements consist of "stray remarks" made by a supervisor uninvolved in the plaintiff's termination. (ECF No. 38 at 6-7.)

The "ultimate issue" in any employment discrimination case is "whether the plaintiff has met his burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' *i.e.*, that there was discriminatory intent." *Pronin v. Raffi Custom Photo Lab., Inc.*, 383 F. Supp. 2d 628, 635 (S.D.N.Y. 2005) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000) (citation omitted)). Verbal comments can constitute evidence of discriminatory motivation if a plaintiff demonstrates "a nexus" between the allegedly discriminatory statements and a defendant's decision to terminate the plaintiff. *Id.* at 636-37 (citations omitted). The Second Circuit has recognized that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). "But there is no bright-line rule for when remarks become 'too attenuated' to be significant to a determination of discriminatory intent." *Tolbert v. Smith*, 790 F.3d 427, 437 (2d Cir. 2015).

Accordingly, in determining whether statements have the "tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class," *Tomassi*, 478 F.3d at 116, courts in the Second Circuit consider the following factors: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry v. Wyeth Pharm. Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (citing *Adam v. Glen Cove Sch.*, No. 06-CV-1200, 2008 WL 508689, at *7 n.8 (E.D.N.Y. Feb. 21, 2008) (citations omitted)).

During his deposition, the plaintiff testified about various remarks directed to him or made in his presence. For example, the plaintiff testified that unnamed firefighters at the BHS referred to him as "priority hire" and joked among themselves that he could be their next chief or captain because of his retroactive seniority. (Bresilien Dep. at 51:7-52:9, 53:15-23.) Lieutenant Bradley referred to him as "an old man" and asked a BHS doctor, "[W]hat's he still doing here?" (*Id.* at 69:11-18.) Finally, the plaintiff testified that Lieutenant Bradley and Captain Boccaro made him stand at attention against a wall for an hour as punishment for not showing enough respect. (*Id.* at 69:19-70:18.) Lieutenant Bradley denied this conduct during his deposition, and denied having any interactions with the plaintiff at all during his time at the BHS. (Bradley Dep. at 21:19-22, 24:7-23.)

The defendants argue that the content of the disputed remarks is not discriminatory because it is neutral, does not reference race and does not reflect any racial animus. (ECF No. 38 at 6.) I disagree. As a Black probationary firefighter attending fire school for the first time at the age of forty-two, the plaintiff's connections to the district court's remedial program were

obvious. The comments, if they were made, can be interpreted as expressing hostility about his hiring, and insinuating that Black probationary firefighters had not earned, or were not worthy of membership in the firefighter ranks. Therefore, I find that a reasonable juror could view these remarks as discriminatory.

Nevertheless, the plaintiff has not raised a triable issue of material fact about whether Lieutenant Bradley's allegedly discriminatory conduct motivated the decision to terminate the plaintiff. "In order for the remarks to be deemed significant," the plaintiff must show "their nexus to the adverse employment decision." *Brollosy v. Margolin, Winer & Evens, LLP*, No. 04-CV-0873, 2006 WL 721433, at *10 (E.D.N.Y. Mar. 20, 2006) (citing *Pronin*, 383 F. Supp. 2d at 636-37 (collecting cases)). The evidence in the record about who made the remarks, when the remarks were made and the context of the remarks does not show a nexus between the remarks and the plaintiff's termination. Lieutenant Bradley was a supervisor, but there is no evidence in the record that he was involved in, much less a decision-maker for the medical evaluation processes that precipitated the plaintiff's termination.[7] Lieutenant Bradley testified that he had no involvement with the boarding process (Bradley Dep. at 16:1-5) or evaluations of probationary firefighters at the BHS (*id.* at 20:1-19), and the plaintiff admitted that duty status designations were "solely within the discretion of the BHS physicians" (Pl.'s 56.1 ¶ 45). In light of these factors, the defendants' alleged conduct does not constitute sufficient evidence to support a *prima facie* case of racial discrimination.

b. *The Defendants' Legitimate, Non-Discriminatory Reasons*

Even if the plaintiff established a *prima facie* case of race discrimination, the defendants offer legitimate, non-discriminatory reasons for his termination that the plaintiff has not rebutted

---

[7] The other firefighters are unnamed and there is no context for their comments about the plaintiff's priority status—for example, when the remarks were made, or the rank of the people who made them.

as pretextual. The employer's "burden of showing a legitimate non-discriminatory reason for its actions is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory." *Brierly v. Deer Park Union Free Sch. Dist.*, 359 F. Supp. 2d 275, 291 (E.D.N.Y. Mar. 23, 2005) (citing *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985)).

The defendants' legitimate, non-discriminatory reason for firing the plaintiff was that his medical conditions rendered him incapable of performing firefighting duties. The record is replete with evidence of the plaintiff's deteriorating health. While still on light duty for a back injury sustained in training, the plaintiff went to the emergency room on December 3, 2013, complaining of headaches, a cough and shortness of breath. (Pl.'s 56.1 ¶¶ 65, 67.) As a result, the BHS physicians placed the plaintiff on medical leave until March 10, 2014, which made him miss the start date for the next fire school class in January of 2014. (*Id.* ¶ 31.) Over those ninety-eight days of medical leave, the plaintiff visited BHS doctors nine times. (*See* ECF No. 36-14 at 15-24.) The doctors diagnosed him with reactive airway disease and prescribed Albuterol and Symbicort to treat his symptoms. (Pl.'s 56.1 ¶¶ 73-74.)

By the time of his termination, the plaintiff had been on medical leave for 105 days, on light duty for 379 days and on full duty for less than forty-five days, and had never completed fire school. (*Id.* ¶¶ 79, 81-82.) According to the Chief Medical Officer of the FDNY, the plaintiff would "never be able to perform the duties of a firefighter with the FDNY" as a result of his "persistent respiratory symptoms." (ECF No. 36-11 ¶¶ 19-20.) Even the plaintiff agreed during his deposition that someone with asthma cannot perform a firefighter's job, and did not deny that he had asthma and other health conditions. (Bresilien Dep. at 92:22-93:1 ("Q. Do you

14

believe you can perform the duties of a firefighter with asthma? A. If you have asthma, no. Q. Are you disputing that you have asthma? A. Well, I cannot dispute that I have asthma.")).

In light of this evidence, the defendants have satisfied their burden of showing that legitimate concerns about the plaintiff's health and fitness—and not his race—made him ineligible for firefighting school, caused changes in his duty status and resulted in his termination.

A plaintiff may satisfy his burden at the pretext stage by identifying direct evidence of a discriminatory motive or an indirect showing that the employer's proffered reasons are unworthy of credence. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *see also Brierly*, 359 F. Supp. 2d at 291 ("A discrimination claimant may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.") (citations and internal quotation marks omitted). The plaintiff offers neither. Instead, he states that he "intends to establish at trial" that the defendants' proffered reasons "were pretextual in nature to conceal the discriminatory intent." (ECF No. 43-1 at 9.) That is not enough at the pretext stage of the *McDonnell Douglas* analysis; the law requires the plaintiff to make that showing on summary judgment.

The plaintiff has not established a *prima facie* case of race discrimination. Even if he had, the defendants proffered a legitimate, non-discriminatory rationale for the plaintiff's firing that the plaintiff did not rebut. Accordingly, I grant the defendants' motion for summary judgment on the Section 1983 race discrimination claim.

## II.    Retaliation Claims Under Title VII, Section 1983, NYSHRL and NYCHRL

### a.  *Retaliation under Title VII*

Retaliation claims under Title VII are also evaluated under the three-step burden-shifting framework of *McDonnell Douglas*. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  Under the first step, the plaintiff must establish a *prima facie* case of retaliation by showing 1) participation in a protected activity, 2) the defendant's knowledge of the protected activity, 3) an adverse employment action and 4) a causal connection between the protected activity and the adverse employment action. *Id.* at 844 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).  "Although the burden that a plaintiff must meet at the *prima facie* stage is minimal, the plaintiff must proffer at least competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Garrett v. Garden City Hotel, Inc.*, No. 05-CV-0962, 2007 WL 1174891, at *19 (E.D.N.Y. Apr. 19, 2007) (citing *Cronin v. Aetna Life Ins.*, 46 F.3d 196, 204 (2d Cir. 1995)).

Once the plaintiff establishes a *prima facie* case of retaliation, the defendant "may rebut [it] by articulating a legitimate, non-retaliatory reason for the adverse employment action." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (alterations and citations omitted).  "If the defendant provides such an explanation, the presumption of retaliation dissipates, and the plaintiff must prove that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013) (internal citation and quotation marks omitted)).  "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 846.

The defendants do not dispute that the plaintiff has established three elements of a *prima facie* case of retaliation: that his participation in the district court's remediation program was a protected activity, that the defendants knew that the plaintiff was a "priority hire," and that the plaintiff suffered an adverse action when he was terminated from his position as a probationary firefighter. (ECF No. 38 at 15.) The defendants argue, however, that the plaintiff has not established a causal connection between any alleged employment actions and his protected activity. (*Id.*)

To establish a "causal connection" in the Second Circuit, a plaintiff must show that his protected activity was a "substantial motivating factor" in the adverse employment decision. *See Deters v. Lafuente*, 368 F.3d 185, 190 (2d Cir. 2004) (per curiam) (citation omitted). "This may be done either directly, by evidence of retaliatory animus, or indirectly, by circumstantial evidence, such as by showing that the protected activity was closely followed in time by the adverse employment decision." *Bierce v. Town of Fishkill*, 656 F. App'x 550, 552 (2d Cir. 2016) (summary order) (citing *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

The plaintiff seems to allege the following instances of retaliatory conduct:[8] subjecting him to training exercises that he was meant to fail; placing him on light duty to render him ineligible for reentry into fire school; ignoring the "statutory mandate" to assign him tenure; assigning him to fire hydrant inspection; suspending his medical board proceeding to deprive him of disability retirement; foregoing his performance evaluations; and terminating him. (ECF No. 16 ¶¶ 5, 42-43, 45, 58, 62; ECF No. 43-1 at 9.) Only one of these instances—his assignment to fire hydrant inspection in October of 2013—is proximate to evidence in the record of

---

[8] The plaintiff's opposition brief—which he filed five months late and only at the Court's urging—is so sparse that I am forced to divine his arguments from the complaint, the record and the brief.

retaliatory animus. The plaintiff testified that he overheard Lieutenant Bradley exclaim to the plaintiff's doctor, "[H]e's an old man, what's he still doing there?" (Bresilien Dep. at 69:11-18.) According to the plaintiff, these comments caused the doctor to reassign him to full duty status which, in turn, resulted in the plaintiff having to do a month of "demeaning" fire hydrant inspection. (ECF No. 16 ¶¶ 42-44; Bresilien Dep. at 90:16-21.) The defendants argue that there is no "direct proof of retaliatory animus" and that the undisputed fact that BHS doctors made decisions in their sole discretion severs any causal link between Lieutenant Bradley's alleged statements and the plaintiff's assignment to fire hydrant inspections. (ECF No. 38 at 16.)

I find that Lieutenant Bradley's statements, if he made them, could constitute proof of retaliatory animus for the reasons described above. The evidence that these statements influenced the doctor to change the plaintiff's duty status is far from clear; Lieutenant Bradley testified that he "ran the Bureau of Health Services basically 24/7 whatever happened during the course of day or night." (Bradley Dep. at 14:16-18.) Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could find that Lieutenant Bradley influenced the doctor to reassign the plaintiff to full duty status because of his hostility to the plaintiff's status as a priority hire.

Nevertheless, the defendants have established that each employment action, including the decision to designate the plaintiff as full duty in October of 2013, was taken for legitimate, non-retaliatory reasons. The plaintiff was injured on August 6, 2013, and placed on medical leave the next day. (Pl.'s 56.1 ¶¶ 50-51, 54-55.) The medical records establish that doctors at the BHS monitored the plaintiff's condition closely over the next sixty-nine days, evaluating his back, knees and feet eleven times between August and October of 2013. (ECF No. 36-14 at 3-14.) By the end of September, the plaintiff reported that his symptoms were improving (*id.* at 11) and on

18

October 10, 2013, his back had improved while his foot showed "good movement" (*id.* at 13.) A week later, doctors determined that the plaintiff could return to full duty effective October 21, 2013. (*Id.* at 14.) This contemporaneous evidence shows that the plaintiff's change in status—from medical leave to full duty—was the product of comprehensive and legitimate medical evaluation.[9]

That the plaintiff was assigned to inspect fire hydrants while he was on full duty does not change this analysis. The record evidence demonstrates that probationary firefighters who are placed on medical leave before completing fire school must perform non-firefighting duties, such as hydrant inspections, until they can enroll in the next fire school class. (Pl.'s 56.1 ¶ 46.) As the next fire school class did not begin until January 27, 2014 (*id.* ¶ 31) the plaintiff's assignment to hydrant inspection in October of 2013 complied with FDNY policy. Accordingly, the defendants have rebutted the *prima facie* case of retaliation with substantial evidence that the plaintiff's status was changed because of legitimate, non-retaliatory reasons relating to his health.

The plaintiff also makes vague but repeated claims that the medical board process was somehow corrupted, but cites no evidence in the record to support these accusations. The plaintiff has never denied that he was injured—in fact, he tried to resign shortly after his first injury and the Fire Commissioner persuaded him to continue his training. Nor has he denied that he was actually sick and suffering from asthma. The medical records establish his condition, and the plaintiff admitted as much in his deposition.

---

[9] Furthermore, the decision to upgrade the plaintiff to full status benefited his career since it enabled him to enroll in the next fire school class beginning January 27, 2014. Although BHS doctors placed the plaintiff on medical leave again on December 3, 2013—before he could join the next class—they did so in response to the onset of the plaintiff's respiratory disease. (Pl.'s 56.1 ¶¶ 65, 67).

Since the defendants rebutted the *prima facie* case of retaliation, the plaintiff must prove

that the retaliation "was the but-for cause of the challenged employment action." *Ya-Chen Chen*,

805 F.3d at 70. The plaintiff has made no such showing, except to promise that he "intends to

establish at trial" that the defendants' proffered reasons were "pretextual." (ECF No. 43-1 at 9.)

That is not sufficient. Accordingly, I grant the defendants' motion for summary judgment on the

Title VII retaliation claim.

### b. *Retaliation under the NYSHRL and NYCHRL*[10]

The plaintiff also asserts violations of the NYSHRL and NYCHRL. Because Title VII

and the NYSHRL are evaluated under the same standard, summary judgment on the plaintiff's

NYSHRL claims is granted for the reasons provided above. *Reed v. A.W. Lawrence & Co., Inc.*,

95 F.3d 1170, 1177 (2d Cir. 1996) ("We consider [the plaintiff's] state law claims in tandem

with her Title VII claims because New York courts rely on federal law when determining claims

under the New York [State] Human Rights Law.") (citations omitted). The NYCHRL, which

must be analyzed separately from any analogous state and federal claims, *Mihalik v. Credit

Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013), is broader than Title VII and

the NYSHRL. *Ya-Chen Chen*, 805 F.3d at 75-76.

Section 8-107(7) of the NYCHRL prohibits employers from "retaliat[ing] or

discriminat[ing] in any manner against any person because such person has . . . opposed any

---

[10] The Court exercises supplemental jurisdiction over the plaintiff's state law claims pursuant to 28 U.S.C.
§§ 1367(a), (c). "A district court's decision whether to exercise [] jurisdiction after dismissing every
claim over which it had original jurisdiction is purely discretionary," *Carlsbad Tech., Inc. v. HIF Bio,
Inc.*, 556 U.S. 635, 639 (2009), and entails weighing several factors including "the values of judicial
economy, convenience, fairness, and comity," *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350
(1988). These factors weigh in favor of maintaining jurisdiction. I am familiar with this case, having
presided over it since 2016 and adjudicated two dispositive motions. Moreover, the state law claims are
not novel and, in many respects, mirror the federal law claims. Under these unique circumstances, I am
exercising supplemental jurisdiction.

practice forbidden under this chapter . . . " N.Y.C. Admin. Code § 8-107(7). The code defines retaliation broadly:

> The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment, . . . or in a materially adverse change in the terms and conditions of employment, . . . provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity.

*Id.*; *see also Rozenfeld v. Dep't of Design & Constr. of N.Y.C.*, 875 F. Supp. 2d 189, 208 (E.D.N.Y. 2012) ("[T]he [NY]CHRL is slightly more solicitous of retaliation claims than federal and state law because, rather than requiring a plaintiff to show an 'adverse employment action,' it only requires him to show that something happened that was 'reasonably likely to deter a person from engaging in protected activity.'") (citation omitted)). Accordingly, "to prevail on a retaliation claim under the NYCHRL, the plaintiff must show that [he] took an action opposing [his] employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (internal citations omitted).

At the summary judgment stage, the plaintiff must establish a *prima facie* case of retaliation, after which the defendant has the opportunity to offer legitimate reasons for its actions. *Ya-Chen Chen*, 805 F.3d at 75-76. Summary judgment is appropriate "if no reasonable jury could conclude either that the defendant's 'reasons were pretextual,' or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least 'in part on discrimination.'" *Ya-Chen Chen*, 805 F.3d at 76 (internal citations omitted). In other words, "summary judgment is appropriate if 'the record establishes as a matter of law' that discrimination *or* retaliation 'played no role' in the defendant's actions." *Id.* (citing *Mihalik*, 715 F.3d at 110 n.8) (alterations omitted)) (citation omitted).

Under these standards, there is a genuine dispute as to whether Lieutenant Bradley retaliated against the plaintiff because of his status as a priority hire and his participation in the firefighter exam litigation. First, there is an issue of fact about whether Lieutenant Bradley remarked to the plaintiff's doctor that the plaintiff was "an old man, what's he still doing here[?]"[11] If the jury credits this testimony and finds that those remarks "played a role" in the plaintiffs' assignment to fire hydrant inspections, Lieutenant Bradley will be liable for retaliation under the NYCHRL. Second, there are issues of fact as to whether Lieutenant Bradley retaliated against the plaintiff in ways that did not affect his employment status. For example, the plaintiff testified that Lieutenant Bradley ordered him to his office on multiple occasions for no reason and reprimanded him for not showing enough respect by making him stand against a wall for an hour. A jury could find that this behavior is reasonably likely to deter a person from joining the FDNY as a priority hire, participating in civil rights litigation or speaking out against discriminatory practices. Accordingly, summary judgment is not appropriate for the plaintiff's claim of retaliation under the NYCHRL against Lieutenant Bradley.[12]

   c. *First Amendment Retaliation under Section 1983*

"To survive summary judgment on a First Amendment retaliation claim, a public employee must establish a prima facie case by bringing forth evidence showing that (1) he has engaged in protected First Amendment activity, (2) he suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment

---

[11] For the reasons discussed above, Lieutenant Bradley's comments, if made, constitute proof of retaliatory animus—they expressed hostility toward the plaintiff's participation in the remedial program, and reflected a view that black probationary firefighters had not earned, or were not worthy of membership in the firefighter ranks.

[12] The NYCHRL provides for individual liability of an employee "regardless of ownership or decision-making power." *Banks v. Corr. Servs. Corp.*, 475 F. Supp. 2d 189, 200 (E.D.N.Y. 2007) (citing *Murphy v. ERA United Realty*, 674 N.Y.S.2d 415, 417 (2d Dep't)).

action." *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015) (citation, alterations and internal quotation marks omitted).  A plaintiff may establish causation either "directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Id.* (citation omitted).

If a plaintiff establishes a *prima facie* case, the government still will be entitled to summary judgment by demonstrating by a preponderance of the evidence that it would have taken the same adverse employment action regardless of the protected speech. *Smith*, 776 F.3d at 123 (citations omitted).

The defendants stipulate that the plaintiff's participation in the district court's remedial program is protected by the First Amendment, but argue that the plaintiff has not established the requisite causal connection.  (ECF No. 38 at 18.)  For the reasons discussed above, I find that there is a genuine dispute of fact on the issue of causation in the plaintiff's *prima facie* case, but that in any event, the defendants have established that the FDNY would have taken the same employment actions with respect to the plaintiff because of his medical history and regardless of his status as a priority hire.  Accordingly, I grant summary judgment on the First Amendment retaliation claim under Section 1983.

### III.    Due Process Claim under Section 1983

The Fourteenth Amendment provides that the State may not "deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV.  In order to establish a valid claim for deprivation of procedural due process pursuant to Section 1983, a plaintiff must show that a government entity deprived him of a right secured by law. *Finley v. Giaccobe*, 79 F.3d 1285, 1296 (2d Cir. 1996) (citations omitted).  In the employment context,

> [i]t is well settled that in considering a claimed deprivation of due process . . . a
> two-step inquiry is required.  First, it must be determined whether a plaintiff has a

property right in continued employment. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985); *Narumanchi v. Board of Trustees of Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988). Assuming a property right exists, a court then must determine if that right was deprived without due process of law. This leads to the second step of the inquiry; determining how much process the plaintiff was due and whether the constitutional minimum was afforded in the particular case. *See Narumanchi*, 850 F.2d at 72.

*Whiting v. Inc. Vill. of Old Brookville*, 8 F. Supp. 2d 202, 210 (E.D.N.Y. 1998), *aff'd sub nom. Whiting v. Old Brookville Bd. of Police Comm'rs.*, 4 F. App'x 11 (2d Cir. 2001).

The defendants argue that the plaintiff had no property right in continued employment because he was a probationary employee who could be terminated at any time. (ECF No. 38 at 21.) According to the defendants, the plaintiff was still a probationary firefighter at the time of his termination because, per New York City regulations, the one-year probationary period had been extended by the time he had spent on light duty or medical leave. (*Id.* at 22; *see also* Pl.'s 56.1 ¶ 18 (citing Personnel Rules and Regulations of the City of New York, Tit. 55, App. A, § 5.2.8.(b)).

The plaintiff does not dispute that he was a probationary firefighter at the time of his termination, or that he had multiple health challenges that kept him from completing the training or being on fully duty status. (*See* ECF 43-1 at 10.) At the same time, he says that the defendants manipulated his status to extend his probationary period. (*Id.*) The plaintiff says the BHS Physician Board hearing "was essentially a pretext to keep Plaintiff on light duty and extend his probationary term so that he could be summarily terminated after 17 months employment." (*Id.*)

As discussed above, the record establishes that BHS physicians carefully monitored the plaintiff's medical condition, and that their legitimate diagnoses prompted the changes in his duty status. In medical evaluations in the months preceding and following the BHS Physician

Board hearing, the plaintiff continually reported shortness of breath, wheezing and other symptoms of asthma; he also started to use a rescue inhaler. (ECF No. 36-14 at 24-32.) Because of these symptoms, BHS doctors kept the plaintiff on light duty from March 10, 2014, to the date of his termination on January 14, 2015. There is no evidence in the record that the defendants kept the plaintiff on light duty status to extend his probationary status. Accordingly, it is undisputed that the plaintiff was a probationary employee at the time of his termination.

Because probationary employees have no "reasonable expectation in continued employment," the plaintiff has no actionable property right on which to base his Section 1983 claim. *Finley*, 79 F.3d at 1298. Accordingly, I grant summary judgment to the defendants on the Section 1983 due process claim.

**IV.     Municipal Liability**

A municipality can be held liable when "action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Serv. of N.Y.C.*, 436 U.S. 658, 691 (1978). As discussed above, the plaintiff has not established a constitutional tort and absent an underlying constitutional violation, there can be no municipal liability. *City of L.A. v. Heller*, 475 U.S. 796, 799 (1986). Therefore, I grant the defendants' motion for summary judgment for municipal liability on the Section 1983 claims.

**V.      Individual Liability**

To establish a Section 1983 claim against an individual defendant, the plaintiff must establish that the defendant was acting under color of state law and that the conduct deprived the plaintiff of a constitutional or federal statutory right. *See Back v. Hasting on Hudson Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004) (citations omitted). For the reasons discussed above, the defendants' conduct did not deprive the plaintiff of a constitutional or federal statutory right.

Therefore, I grant the defendants' motion for summary judgment for individual liability on the Section 1983 claims.

## CONCLUSION

For the reasons explained above, I grant the defendants' motion for summary judgment on the plaintiff's federal and state law claims, but deny the defendants' motion for summary judgment on the plaintiff's claim for retaliation under the New York City Human Rights Law as against Lieutenant Bradley.

**SO ORDERED.**

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge

Dated: March 17, 2020
    Brooklyn, New York